MEMORANDUM OF DECISION
This case presents consolidated petitions for the termination of the parental rights of Joseph K. and Pamela K. to their two sons, Christopher, now age seven and Joseph M.,[2] who will be two years old on December 12, 1998. The Department of Children and Families, hereafter "DCF", filed a petition concerning Christopher on April 11, 1997 and concerning Joseph M. on May 8, 1998. The petitions were consolidated for trial. Pamela K., the children's mother, is addicted to both alcohol and illegal drugs, including cocaine. Her addictions and regular intoxication caused her to leave Christopher for long periods of time with his older half-sister, Shannon, when Shannon was only eleven and twelve years old. On January 16, 1992, Pamela placed Christopher voluntarily with DCF. When he was returned to her, the pattern of leaving him with inappropriate caretakers continued. Christopher was removed by DCF on September 28, 1992 when he was sixteen months old.
Joseph M.K. was born on December 12, 1996, six weeks prematurely. He tested positive for cocaine, PCB and barbiturates at birth. He was placed in foster care directly from the hospital in which he was born and has never been in the care of his biological mother. The children's father, Joseph K., was never involved with Christopher while he was in Pamela's care and has had no contact with Joseph M.
Both children were adjudicated neglected and uncared-for CT Page 14876 children; Christopher on January 28, 1993 and Joseph M. on April 7, 1997. Christopher's commitment to DCF has been extended three times and Joseph M.'s once. On November 9, 1997, the court found that reunification efforts were no longer appropriate between Christopher and his parents (Holden, J.) The same finding was made for Joseph M. on February 25, 1998. The two cases, as indicated, were consolidated for trial on July 23, 1998 and counsel for the father appointed in Joseph M.'s case. Trial commenced on October 27, 1998 and concluded on October 29, 1998. Both Pamela and Joseph K. attended the trial and contested the allegations of the petitions. Amendments to the consolidated petitions were granted by the court on October 27, 1998 and the original adjudicatory date of Joseph M.'s petitions of May 8, 1998 was retained for both petitions.
The allegations of the amended petitions are that Pamela K. and Joseph K. had abandoned the children and that each had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, such parent could assume a responsible position in the lives of the children. Further, DCF alleged that there was no ongoing parent-child relationship between the biological father and his two sons. Connecticut General Statutes § 17a-112(c)(3)(A), (B) and (D). As to the last ground, the holding of In re Valerie D., 223 Conn. 492,613 A.2d 748 (1992) makes it clear that it cannot be sustained as between Joseph K., the father and his youngest son, Joseph M. K., as its use is improper where DCF removed the child a few days following his birth and the child has remained in foster care ever since that time. The court dismisses this ground as to Joseph M. K.
At trial, ten exhibits were received into evidence. The court heard the testimony of Linda Weiss, the DCF social worker who was the primary worker on the case from January 1997 to September 1998, Mr. Peter Gandelman, who performed a sexual abuse evaluation of the father in 1994 and Gordon Nelson, a therapist providing services for Christopher. From the evidence the court finds the following facts:
 1. FACTS A. Pamela K.
Pamela K. is now forty-one years old. Her family background CT Page 14877 reflects none of the turmoil that has taken place in her own life; she was the oldest child of two raised by two parents, both of whom are now deceased. She graduated from high school. She first became known to DCF in 1985, when her oldest child, Shannon, who was five years old, was the victim of repeated sexual abuse by Joseph K., her stepfather. As a result of the child's disclosures of abuse, Joseph K. was arrested, convicted and incarcerated for a period of five years. He was released in 1990. Unfortunately for Shannon, her mother again let Joseph back into the household, trusting that he had learned his lesson. Despite his years of incarceration, Joseph had not reformed and began to repeatedly abuse Shannon again. He was again arrested, convicted and received a term of imprisonment of one year for these crimes on August 3, 1993.
In addition to Shannon's difficulties, DCF became aware of Pamela's significant alcohol addiction and periods of severe intoxication which placed her son, Christopher, at risk. Christopher was born on May 28, 1991. When he was just eight months old, his mother placed him voluntarily in foster care with DCF. He was returned to his mother five months later, but repeated police referrals concerning Pamela's intoxication and Shannon's attempt to care for her infant half-brother continued. There were four such referrals and after the last referral, Christopher was placed in foster care again. Given the emphasis on family reunification in these years, when Pamela made progress in a treatment program she attended, Christopher was briefly returned to her in 1993, only to be removed once again due to her intoxication. Pamela was unable to maintain sobriety and the pattern of repeated relapses suffered by so many alcoholics and addicts was observable in her life as well, with tragic consequences for her son, Christopher.
The next months and years were characterized by Pamela's attendance at various drug and alcohol treatment programs, three of which she completed. Those programs included family therapy at Connecticut Mental Health in 1990, inpatient treatment at Bridgeport Mental Health for substance abuse in February, 1992, as well as an eight week outpatient substance abuse and aftercare program in 1995. Pamela received outpatient treatment at the Cochran Clinic in 1995, individual counseling at the Lower Naugutuck Valley Council for Drugs and Alcohol Abuse in 1996 as well as addiction prevention treatment and a substance abuse evaluation at Valley Mental Health in 1996. CT Page 14878
From 1993 to the early winter of 1996, when Pamela sporadically visited with Christopher, nothing made any lasting difference in the course of her life. She seemed bent on continuing to lead a drug-addicted, destructive life. When pregnant with Joseph, Pamela only attended two of her prenatal check-ups and her addiction had grown worse and more severe since Christopher was an infant. The DCF social worker testified that the toxicology screens for the new-born infant Joseph M. K. showed significant amounts of cocaine, PCP and barbiturates. After his birth, he suffered from significant withdrawal symptoms. Joseph M. was placed into foster care immediately upon his discharge from the hospital. Since his placement in December 18, 1996, Pamela's behavior has continued as before during the early years of Christopher's placement. While Pamela claims to have been sober for some time, her criminal record reflects a arrest on January 15, 1997 for possession of narcotics and on January 15, 1998 for possession of cocaine.
The court concludes from the evidence that, despite the myriad services she has received, Pamela remains drug and alcohol addicted. Her overwhelming need to be high continues to destroy her life and make her totally incapable of parenting not only these children, but any child. She cannot remain reliably sober to visit the children when possible, to send cards and gifts or letters to her children, to attend programs to help her deal with her addictions and to begin to make the serious internal changes she must make to reclaim a sober life. It is as if the terrors of a sober existence are greater for Pamela than the obliteration of her awareness through the use of illegal drugs and alcohol with the destructive consequences which flow from these acts.
Pamela has exercised about half of the visitation she has been offered with her children. In recent months, Pamela has visited more regularly. Christopher retains some connection to her and calls her Mom Pamela. The person, however, who has been most consistent is the boys' half-sister, Shannon, who is now eighteen. By agreement of the parties, Shannon attended the trial and argued that she should be considered a placement resource. Christopher, in particular, looks forward to seeing her and upon her mention of making a home for him, has stated that he would like this to happen. He is otherwise contented and doing well in his foster home and is attached to his foster parents.
 B. The biological father, Joseph K. CT Page 14879
Joseph K. is now thirty-nine years old and is employed. He experienced a normal childhood, graduated from high school and became a welder. In 1984, he became involved with Pamela, to whom he was married and from whom he has been divorced since 1995. The record reflects alcohol and drug abuse by Joseph as well as by Pamela. But more serious is the fact that Joseph has never acknowledged or accepted the consequences of his abuse of his step-daughter. Mr. Peter Gandelman, the therapist who performed a sexual abuse evaluation of Joseph in 1994, stated that when confronting him with this behavior, he excused his behavior by stating that Shannon lied because she wanted him out of the house. While incarcerated, he did not address his sexual offender issues and did not participate in those programs which were available to him. He never sought the professional help he required in order to begin to deal with his heinous transgressions. Mr. Gandelman stated that once Mr. K. sought such treatment, particularly in light of his denial, treatment would take a long time, at least five years.
It is hard to consider a man who violated a small child and then returned after five years of incarceration to do it again. It is harder yet to fathom the depravity of these acts resulting in the destruction of the personal and physical integrity of a child, who will have life long emotional consequences from this abuse. And it is even harder to imagine what services would be effective in rehabilitating such an abusive individual, particularly Joseph, who has never expressed any remorse for his acts and whose incarceration apparently did not teach him anything about his aberrant behavior.
At trial, Joseph F. argued strenuously that DCF was obligated to do more than simply have a sexual abuse evaluation performed which recommended further treatment. DCF, he stated, made no further referrals. He maintained this effort on the part of DCF was simply not adequate to meet the threshold requirement of offering reasonable services to facilitate reunification of the children with their biological father and that therefore the petitions as to the father should be dismissed. He stated that he never knew what he had to do to reclaim his children and that DCF never told him what was expected of him.
There is no doubt that reasonable efforts must be made by DCF as a necessary constitutional predicate to the termination of parental rights, In re Eden F., 48 Conn. App. 290, 710 A.2d 771
(1998), cert. granted, In re Eden F., 245 Conn. 917, 669 A.2d 636
CT Page 14880 (1998) as to whether those efforts must be proven by DCF and by clear and convincing evidence. In this case, however, the record reflects facts which do not support the respondent father's position. He was not part of the family when Christopher was an infant. He did not seek visitation when this child was first placed. Joseph K. was offered visitation while incarcerated, which he refused. Upon his release from incarceration, Mr. Gandelman's evaluation found him to be at high risk of relapse to sexually offend. Mr. Gandelman also found, based on the limited information that the respondent father supplied, that there was a possibility Joseph K. would be attracted to preadolescent sexual victims, which would include male children as well as females and that as a result, visitation was not recommended. Subsequent to these findings, the respondent father agreed in court on July 17, 1994 that he would seek treatment at the Meriden Sexual Offenders Program and sign releases to allow DCF to obtain information from the program. As a result of this agreement and court order, the motion for visitation with his two sons was not heard, but continued.
But Joseph K. never attended the Meriden program nor did he sign releases for any information concerning such treatment. From the court's optic, it is Joseph K. who did not take advantage of the various services offered to him, and not DCF who failed to take action. While it is true that the Meriden program is one which Joseph K. himself offered, nonetheless DCF acquiesced in this course of conduct and was prepared to consider visitation at such time as the program was completed by Joseph. And so what might in retrospect be called a "services and reunification stalemate" ensued. No further services or efforts at reunification were to be made with Joseph until he had completed the program which he requested. Since he never attended and never signed releases, DCF never offered any additional services or made any further efforts at reunification.
The court concludes, that while DCF perhaps could have done more, the offering of services to parents whose children are in foster care does not occur in a vacuum. Parents must be willing to participate in services and in this case, by his ongoing refusal to deal with the sexual abuse issues which occasioned two periods of incarceration, Joseph K. clearly demonstrated his unwillingness to participate. More is not required of DCF or any child placement agency. The court concludes, that under these circumstances, what DCF did offer was reasonable. CT Page 14881
Further, the court had previously found that reunification efforts were no longer required (Holden, J.) Connecticut General Statutes § 17a-112(c) states that the court may grant a petition for the termination of parental rights if it:
 "finds by clear and convincing evidence that DCF has made reasonable efforts . . . to reunify the child with the parents. . . .providing that such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 that such efforts are no longer appropriate." (emphasis added).
Once a § 17a-110 hearing has been held and the finding made, as in this case, reasonable efforts findings by this court are no longer required.
 C. The children, Christopher and Joseph M. K.
Christopher has been seen since 1996 at Clifford Beers for therapy. His therapist, Gordon Nelson, testified that Christopher has many strengths, "he is bright, verbal, well mannered and relates well." He engages in age appropriate activities and is functioning well at school, where he is at grade level and mastering the skills required of him. He remains easily distracted and fidgety, but is not a behavior problem. He does, however, have issues common for other children in foster care who have been removed from their parents. He "struggles with fully accepting where he is at in foster care and whether he will ever return to live with his mother." He found that this child had made a good attachment to his foster family and has been with them for some time, although some ambivalence remains. He stated that, in his opinion, if this child were retained in foster care with ongoing visitation with his biological mother, this "has the potential for further interfering with Chris making some ultimate adjustment in getting on with his life and the issues of childhood." He believed that there would be a greater risk of adjustment issues. He stated that the issue of adoption by his foster parents had come up and that the child is not clear about wanting to be adopted by them. He testified that if Christopher could not go home to live with his mother, he would want to stay with his foster parents and not go to another home.
Joseph M. has done well in his foster home, the only home he has known. He was diagnosed with having toticolis, having a stiff neck, which caused him to lay only on one side as an infant, CT Page 14882 which began to distort the shape of his head. He received physical therapy for this condition and has since recovered. He enjoys sibling visits with Christopher and Shannon. He is bonded to his foster parents who wish to adopt him.
 2. ADJUDICATION
The court concludes, from the clear and convincing evidence, that Joseph K. has abandoned these children. He has done this by not seeking sexual offender treatment, which effectively blocked his contact with them. He has not taken advantage even of the minimal contact available to him, of inquiring about their welfare and by sending them cards, gifts or letters through DCF.
"Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No.9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). There can be no doubt that the facts support this ground for termination of parental rights concerning Joseph K. and had existed for more that a year prior to the filing of the termination petition.
Pamela's situation is somewhat different from that of her former husband. Although she has had sporadic contact, she does continue to exhibit interest, love and affection for them. Nonetheless, she has not been able to deal with her addiction to reliably and consistently be available for her children. [The abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In re Kezia M., 33 Conn. App. 12, 18,632 A.2d 1122 (1993). "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In re Rayna M., 13 Conn. App. 23, 37-38, 534 A.2d 897
(1987); In re Migdalia M., 6 Conn. App. 194, 208-209,504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770
(1986). The court concludes, by the clear and convincing evidence, that in the legal sense, Pamela, too, has abandoned her sons. And the circumstances demonstrating this abandonment have been in existence for more than one year prior to the commencement of the petitions for termination of her parental rights on May 8, 1998. CT Page 14883
The court further concludes, from the clear and convincing evidence, that neither biological parent has rehabilitated so that she or he could care for these children within a reasonable period of time. Connecticut General Statutes § 17a-112(c)(3)(B). Christopher was adjudicated a neglected child in 1994 and Joseph M. in 1997. Each has been in foster care for a long time. Both children require permanency and a consistent stable and nurturing home. Neither Pamela, nor Pamela together with her daughter Shannon, nor Joseph are in a position to provide such homes at any time in the reasonably foreseeable future. In Pamela's case it is her drug and alcohol addiction that prevents her from being able to do so. In Joseph's case, it is the failure to deal with his problem of being a sexual offender and all that this implies in his psychological make-up. Each parent has failed to address those factors in their lives which caused them to lose the right to keep the children with them in the home. That very failure today indicates that they had not rehabilitated by May 8, 1998 and the evidence has demonstrated that they are not likely to do so in the foreseeable future.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., above, see also: Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Neither parent has not really begun the process to accomplish such an outcome. Rehabilitation within the foreseeable future is not likely.
The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re JuvenileAppeal (84CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYONDTHE BEST INTERESTS OF THE CHILD 99 (1979.) Both children require permanency and simply cannot wait any longer for the rehabilitation of their biological parents.
The last allegation remaining against the father is that he has no ongoing parent-child relationship with Christopher. While there was some evidence that Christopher may have had unauthorized contact with Joseph K. when Christopher was briefly returned to his mother, there has been no visitation and any relationship that may have existed when the child was an infant CT Page 14884 has long since ended.
 "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Migdalia M., supra; In re Juvenile Appeal (84-3), supra; In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670-671, 420 A.2d 875 (1979).
By the clear and convincing evidence before it, the court finds that no relationship exists and that there is no future hope of its establishment. This ground, too, has been in existence for more than one year prior to May 8, 1998.
 3. REQUIRED FINDINGS
The court makes the following factual findings based upon the clear and convincing evidence required by CGS § 17a-112(e):
1) Appropriate and timely services were provided by DCF, including many treatment programs for alcohol and substance abuse, paternity testing and a sexual offender evaluation for Joseph as well as visitation, visitation assistance and case management services. The services offered to Pamela were extensive. The services offered to Joseph were reasonable, in view of his conduct and failure to take the actions required of him.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as for as possible. As previously outlined, in view of the court's finding that such efforts were no longer required, this finding is also no longer required.
3) DCF set reasonable and realistic goals embodied in the court-ordered expectations in order to reunify the family. Pamela was unable to comply with the expectations set for her, she has failed to maintain her sobriety, failed to avoid contact with the criminal justice system and to visit whenever permitted. There were also times when her whereabouts were unknown. Joseph, too, has failed to address the issues which denied him access to the children. He has never attended or completed any sexual offender treatment. While no expectations were set for him as his CT Page 14885 whereabouts were unknown at the time of Joseph's removal from the home, the record leaves no doubt that he had knowledge of the steps he needed to take for reunification.
4) The feelings and emotional ties of the child with respect to the parents, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Christopher knows his mother and sister, but is also bonded to his foster parents. Joseph M. has never known any other home but that of his foster parents. He has no emotional connection to his mother. Neither child has had contact with their father and there are no emotional ties to him. Both children are bonded to their foster families.
5) Finding regarding the ages of the children. Christopher is seven years old and Joseph M. K. became two on December 12, 1998.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Neither Pamela or Joseph has addressed the issues which led to the removal of the children. Pamela has not been able to remain drug or alcohol free and Joseph has not sought sexual offender treatment. Neither has adjusted their conduct to make the return of the children feasible. Pamela has maintained sporadic contact and Joseph, while not permitted visitation, also did not take advantage of the limited opportunities he had of sending cards or gifts and of inquiring about the children. A return of either Christopher or Joseph M. to either parent is not indicated.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps to encourage Pamela to have a meaningful relationship with her children and to rehabilitate herself, which CT Page 14886 she has been unable to accomplish. The same can be said for Joseph. No economic circumstances have prevented such relationships.
 4. DISPOSITION
Joseph M. has been in foster care all his life. Christopher has been in care since 1992, with some short interruptions. This is a long time for each of the children to be waiting for a permanent home in which to grow as young children. Based on the testimony, the court concludes that it is in the best interests of both children to have permanency soon. Other than their foster parents, who have provided that stability and nurturing each child has required, there is no one else in a position to provide such care for these boys. Pamela's latest period of recovery is only a few months long and fragile. Shannon is just beginning her young life and is not in a position to raise two children, care for herself and her mother. Therefore, the court concludes that a termination of the parental rights of Pamela K. and Joseph K. to Christopher K. and Joseph M. K is in these children's best interests and it is so ordered. The court further appoints the Commissioner of the Department of Children and Families as their statutory parent. It is the court's direction that these children's foster parents, if they continue to be willing to adopt these children, receive first consideration. Further, a permanency plan for Christopher and Joseph M. K. shall be submitted to this court within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session
[2] Because his father's name is also Joseph K., the child will be referred to as Joseph M. K.
CT Page 14887